**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : | Civil Action No. 2:21-cv-04845 |
| v. | : : | |
| JOSEPH A. CAMMARATA, ERIK COHEN, DAVID H. PUNTURIERI, ALPHAPLUS PORTFOLIO RECOVERY CORP., AND ALPHA PLUS RECOVERY LLC, | : : : : : | |
| Defendants. | : : : | |

## COMPLAINT

1.      Starting in approximately 2014, Defendants orchestrated a scheme to steal money from distribution funds established for the benefit of securities fraud victims.

2.      Defendants stole at least $40 million from approximately 400 distribution funds that formed as a result of resolutions of securities class actions and Securities and Exchange Commission ("SEC") enforcement actions, to distribute money obtained through settlements or judgments to injured investors.  Defendants' ill-gotten gains include more than $3 million that they stole from distribution funds from SEC enforcement actions.

3.      Defendants defrauded these distribution funds (and their rightful beneficiaries) by submitting false claims and falsified supporting documents to the distribution fund administrators in the names of at least three entities that did not trade in the underlying securities, and thus were ineligible to recover.

4.      Defendants AlphaPlus Portfolio Recovery Corp. ("AlphaPlus Corp."), Alpha Plus Recovery, LLC ("Alpha Plus LLC") (AlphaPlus Corp. and Alpha Plus LLC are collectively referred to as "AlphaPlus") operate through Defendants Joseph A. Cammarata ("Cammarata"), Erik Cohen ("Cohen"), and David H. Punturieri ("Punturieri") (collectively all defendants are referred to as "Defendants," while Cammarata, Cohen, and Punturieri are collectively referred to as the "Individual Defendants").  Together, the Individual Defendants control AlphaPlus.

5.      AlphaPlus purports to be a "claims aggregator," which, for a fee, submits claims to distribution fund administrators on behalf of clients, such as hedge funds and family offices, which are alleged victims in securities class actions or SEC enforcement actions by nature of their purchases and sales of the underlying securities.

6.      Defendants committed many deceptive acts in furtherance of their scheme, such as:  claiming losses for securities trades that were never made; fabricating brokerage records, trading records, and other securities reports to submit in support of their fraudulent claims; creating false personas to communicate with distribution fund administrators; lying to distribution fund administrators who questioned the claims and documentation; and masking their affiliation with, at times, AlphaPlus and/or the entities in whose name Defendants submitted claims.

7.      Defendants knew, or were reckless in not knowing, that their scheme was illegal. For example, in March 2015, Cammarata emailed Punturieri about Punturieri's failure to follow up with a distribution fund administrator who had probed Defendants' false explanation regarding fabricated trading records, writing:  ". . . I woke up in the middle of the night thinking about JAIL, because we waited a week to hear anything from the admin."  (emphasis in original).

2

8. Defendants funneled the money they received from filing fraudulent claims through a web of accounts controlled by the Individual Defendants.  The Individual Defendants used these stolen assets to pay for numerous personal expenses, such as jewelry, home renovations, watercraft, vacation homes and other real estate, including upkeep on Cammarata's personal Caribbean island.

9. By engaging in the conduct described in this Complaint, Defendants violated, directly or indirectly, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  In addition, by the conduct described herein, Cammarata, Cohen, and Punturieri have also aided and abetted AlphaPlus's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and, unless restrained and enjoined by this Court, will continue to aid and abet violations of that statute and rule.

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief the Court may deem just and appropriate.

11. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].  Defendants, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facility of national security exchanges, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

12.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Defendants transact business in this district.  In addition, certain acts, practices, transactions, and courses of business constituting violations of the federal securities laws occurred within the Eastern District of Pennsylvania, including Defendants defrauding distribution fund administrators located in this district.

## DEFENDANTS AND RELATED ENTITIES

A.     **Defendants**

13.     **AlphaPlus Portfolio Recovery Corp.** is a New Jersey company.  **Alpha Plus Recovery LLC** is a New Jersey limited liability company.  The Individual Defendants own and control Alpha Plus LLC and control AlphaPlus Corp.  The Individual Defendants ignored the corporate form and treated the two entities interchangeably.  For example, payments made by distribution fund administrators on claims submitted by AlphaPlus Corp. were regularly deposited into bank accounts held by Alpha Plus LLC.  Accordingly, the two entities are jointly referred to as "AlphaPlus."  AlphaPlus purports to be a claims aggregator.

14.     **Joseph A. Cammarata ("Cammarata")**, age 47, is a resident of Monmouth Beach, New Jersey.  Along with Cohen and Punturieri, Cammarata, directly or indirectly, owns and controls Alpha Plus LLC and controls AlphaPlus Corp.  From November 2010 to April 2018, Cammarata was the President and Chief Executive Officer of SpeedRoute LLC, a registered broker-dealer.  Since November 2019, Cammarata has been an indirect owner of Levelx Capital, LLC, a registered broker-dealer, through SSA Technologies LLC, which Cammarata, Cohen, and Punturieri own.  From July 2020 to April 2021, Cammarata was employed at Levelx Capital, LLC.  Since December 2019, Cammarata has been the Chief Executive Officer of InvestView, Inc., a publicly-traded company.  Cammarata has overseas property, connections, and bank accounts.  He owns an island in the Caribbean and maintains at

least one residence in Colombia, South America, where he purports to conduct business and has bank accounts.  He is a licensed pilot and owns at least two planes.  He also owns several ocean-going vessels.  He travels extensively using private jet companies, including one company in which he is an owner.  As recently as October 2021, Cammarata traveled to Colombia.  He previously held Series 24, 55, and 62 securities licenses.

15.    **Erik Cohen ("Cohen")**, age 40, is a resident of Manalapan, New Jersey.  Along with Cammarata and Punturieri, Cohen, directly or indirectly, owns and controls Alpha Plus LLC and controls AlphaPlus Corp.  In a response to a regulatory agency, the Individual Defendants indicated that Cohen served as the Chief Executive Officer of Alpha Plus LLC.  Since November 2019, Cohen has been an indirect owner of Levelx Capital, LLC, a registered broker-dealer, through his ownership interest in SSA Technologies LLC.

16.    **David H. Punturieri**, age 41, is a resident of Staten Island, New York.  Along with Cammarata and Cohen, Punturieri, directly or indirectly, owns and controls Alpha Plus LLC and controls AlphaPlus Corp.  Punturieri purports to be the Chief Operating Officer for AlphaPlus Corp.  In a response to a regulatory agency, the Individual Defendants indicated that Punturieri served as the Chief Executive Officer of Alpha Plus LLC.  Since November 2019, Punturieri has been an indirect owner of Levelx Capital, LLC, a registered broker-dealer, through his ownership in SSA Technologies LLC.

B.    **Sham Clients In Whose Name Defendants Submitted False Claims**

17.    **Quartis Trade & Invest Inc.** (**"Quartis"**), is a Bahamian entity purportedly operating as a private algorithmic trading fund.  While Quartis has two named directors, it is controlled by the Individual Defendants.  Defendants submitted false claims to distribution fund administrators in the name of Quartis.

18.    **Nimello Holdings Limited** ("**Nimello**"), is an entity formed under Gibraltar law that purports to be a private trading fund. While Nimello has two named directors, it is controlled by the Individual Defendants. Defendants submitted false claims to distribution fund administrators in the name of Nimello.

19.    **Inversiones Invergasa SAS** ("**Invergasa**") is located in Bogota, Colombia. Although Invergasa is owned by a business partner of Cammarata's and a related individual, it is controlled by the Individual Defendants. In submissions to claims administrators, AlphaPlus has claimed that Invergasa is a client of AlphaPlus and a client of a broker-dealer owned by the Individual Defendants through SSA Technologies LLC. Defendants submitted false claims to distribution fund administrators in the name of Invergasa, and kept the funds received from those claims.

20.    Quartis, Nimello, and Invergasa are collectively referred to herein as "Sham Clients."

**C.    Related Entities**

21.    **Quartis Trade and Investment LLC** ("**Quartis NJ**") was a New Jersey limited liability company. It was controlled by Cohen and Punturieri. In April 2021, Quartis NJ filed a notice of dissolution and termination with the New Jersey Department of the Treasury. When operating, Quartis NJ shared the same address as Alpha Plus LLC. At times, payments received in connection with the fraudulent claims submitted to distribution fund administrators by Defendants in the name of Quartis were deposited into bank accounts in the name of Quartis NJ.

22.    **Nimello Holding LLC** ("**Nimello NJ**") was a New Jersey limited liability company. It was controlled by the Individual Defendants. Like Quartis NJ, in April 2021, Nimello NJ filed a notice of dissolution and termination with the New Jersey Department of the Treasury. When operating, Nimello NJ shared the same address as Alpha Plus LLC. At times,

payments received in connection with the fraudulent claims submitted to distribution fund administrators by Defendants in the name of Nimello were deposited into bank accounts in the name of Nimello NJ.

23.     **PB Trade LLC** is a New Jersey limited liability company located in Manalapan, New Jersey.  It is owned by Cammarata.

24.     **WOT Trading LLC** is a New Jersey limited liability company, located in Old Bridge, New Jersey.  It is owned by Cohen.

25.     **Nine Six Tech Inc.** is a New York limited liability company located in Staten Island, New York.  It is owned by Punturieri.

26.     **ADP Consulting LLC** was a New York limited liability company located in Staten Island, New York.  It was owned by Punturieri.  On information and belief, it was consolidated with Andena Technologies, LLC and renamed Nine Six Tech Inc.

27.     **SSA Technologies LLC ("SSA Technologies")** is a New Jersey limited liability company located in Old Bridge, New Jersey, which purports to be a financial technology company engaged in software development.  It has the same address as Alpha Plus LLC.  The Individual Defendants own SSA Technologies in equal shares, which they hold through corporate entities that they each own.  SSA Technologies is the majority owner of Levelx Capital, LLC, a registered broker-dealer.

28.     **Levelx Capital, LLC ("Levelx")**, formerly **Gentem Capital LLC ("Gentem")**, is a Florida limited liability company located in Old Bridge, New Jersey.  It has the same address as Alpha Plus LLC.  It has been registered as a broker-dealer with the Commission since 2002. SSA Technologies is the majority owner of Levelx.

29.     **SpeedRoute LLC ("SpeedRoute")** is a Delaware limited liability company located in New York, New York.  It has been registered as a broker-dealer with the Commission since 2000.  Defendants represented to distribution fund administrators that, in 2010, SpeedRoute acquired OES Market Group ("OES"), a broker-dealer.

## FACTS

### A.     The Claims and Distribution Process

30.     Civil securities fraud class actions ("class actions") and SEC enforcement actions often conclude, via settlement or judgment, with a pool of money, or a "fund" being established to compensate victims.  Because these types of cases typically involve numerous injured investors, a distribution fund administrator is often employed to solicit claims and distribute the money to qualified, injured parties – those who engaged in securities transactions in the underlying entity during a set period of time.

31.     The settlement documents, stipulations, distribution plans, and/or orders, which are generally publically available, often provide that the funds to be distributed may be held in securities.  Accordingly, while distribution fund administrators evaluate victim-claims and documentation, which can take time, they often hold the funds in escrow in a money market fund or other type of security.  The money market fund or other security is later liquidated in order to fund distributions.

32.     Distribution fund administrators manage all aspects of the claims and distribution process.  This work often includes maintaining a website specific to the applicable settlement or SEC enforcement action, providing notice of the claims adjudication process and related deadlines, evaluating claim submissions, communicating with claimants, and mailing settlement checks.

33.     While many claims are submitted by individual shareholders, traders that are involved in a large number of trades, such as high frequency trading firms, hedge funds, or family offices, sometimes use claim aggregators, which, for a fee, compile large amounts of trades for a client and manage the claims process in dealing with distribution fund administrators.

34.     In evaluating claims, the distribution fund administrator typically performs audits and data integrity checks to confirm that a purported injured investor is entitled to receive compensation from the distribution fund.  For example, distribution fund administrators typically confirm that the submitted documents reflect transactions in the relevant security during the relevant time period, and that the reported transactions reflect a price at which the security traded on the relevant date.

35.      As part of the claims evaluation process, distribution fund administrators may request documentation and information to further evaluate a claimed securities transaction.  The trading dates and holdings of the security must conform to the period of the alleged misconduct.

36.     If the distribution fund administrator identifies any issues with a claim, they may seek additional information from the party submitting the claim, and ultimately can reject the claim, entirely or partially.

**B.     AlphaPlus**

37.     As a claims aggregator, AlphaPlus purports to assist clients engaged in securities trading, such as hedge funds, proprietary investment firms, and family offices, in collecting proceeds recovered in connection with securities class action settlements or SEC enforcement actions.

38.     As part of its services, AlphaPlus purports to identify distribution funds arising from class actions or SEC enforcement actions in which its clients may be eligible to participate,

prepares and files proof of claim forms and supporting documentation with distribution fund administrators, communicates with the distribution fund administrators, and ensures that the distribution proceeds received are accurately allocated to the client's account.  Claims prepared and submitted for clients often contain detail reflecting hundreds or thousands of individual trades purportedly executed during the relevant period of time, typically presented in spreadsheet format.

39.    In exchange for its services, AlphaPlus usually charges and withholds a percentage of the client's distribution proceeds.

C.    **The Fraudulent Scheme**

40.    In early 2014, the Individual Defendants, operating through AlphaPlus, began to steal money from distribution funds by submitting false proof of claim forms and supporting documentation to distribution fund administrators in the name, and for the purported benefit, of Quartis.  In 2015, Defendants expanded their scheme and began submitting false claims in the name, and for the purported benefit, of Nimello.  And, in 2019, Defendants expanded their scheme again, submitting false claims in the name, and for the purported benefit, of Invergasa.

41.    In all instances, the claim forms and supporting documentation submitted by Defendants to distribution fund administrators falsely represented that the Sham Clients had engaged in hundreds or thousands of securities transactions.  However, the Sham Clients did not trade in the underlying securities as claimed.

42.    To support the fraudulent claims, Defendants knowingly and/or recklessly submitted falsified documents, including proof of claim forms, spreadsheets listing phony purchases and sales of the underlying securities at issue, and letters on behalf of the Sham Clients attesting to the truth and accuracy of the trade data.

43.     For the approximately 400 settlements claimed by Defendants in the names of the Sham Clients, Defendants followed a similar process—deceiving distribution fund administrators into making payment on fake claims by providing false documents, assuming phony personas, and telling lies in order to convince the distribution fund administrators that the claims in the names of the Sham Clients were legitimate.

44.     Punturieri and Cohen adopted phony aliases to communicate with distribution fund administrators.  Punturieri used the alias "Paul Delfino" ("Delfino"), the purported Head of Operations, Chief Operating Officer, and/or Filing Manager at AlphaPlus.

45.     Cohen used the alias "Eric Knolls" ("Knolls"), the purported Head of Product Development and/or Chief Technology Officer at AlphaPlus.

46.     Cammarata did not use an AlphaPlus alias.  Instead, Cammarata presented himself as if he was associated with independent broker-dealers when communicating with distribution fund administrators and concealed or falsely denied his actual involvement with AlphaPlus and the Sham Clients.

47.     In carrying out the scheme, typically, Punturieri, using the Delfino alias, submitted false claims to distribution fund administrators.

48.     Defendants submitted a host of false documents to distribution fund administrators to support the false claims.  For example, Defendants submitted false securities trading records, trade data attestation letters, and client agreements.

49.     Defendants falsely represented that Quartis, Nimello, and Invergasa were customers, directly or indirectly, of brokers, including SpeedRoute, OES, Electronic Transaction Clearing, Inc. ("ETC"), and Gentem.  The Sham Clients were not customers of those brokers.

50.     Defendants submitted fake security position reports, brokerage statements, and other documents that they presented as if generated by those four brokers.  However, Defendants used broker-dealer logos and report templates to fabricate the trading records and other documentation, which Defendants falsely represented as legitimate records of activity at those brokers.

51.     When creating the phony trading records, Defendants chose how many trades to submit and, consequently, how big a loss to claim.  For example, on July 9, 2015, after learning how much Nimello received in connection with a false claim, Cammarata wrote to Punturieri, at the Delfino alias email address:  "Not to [sic] shabby…Maybe we were to [sic] conservative on the numbers ;)."

52.     In addition, the Individual Defendants also created trade data attestation letters ("Trade Letters") for each of the Sham Clients, which AlphaPlus provided to distribution fund administrators.  The Trade Letters represented that the securities trades reflected in the claims submission were generated from the internal records and systems of each Sham Client.  Those representations were false.

53.     Defendants also created client agreements between AlphaPlus and each of the Sham Clients.  AlphaPlus provided these phony client agreements, which falsely stated that the Sham Clients would receive between 80% and 90% of collected funds, to distribution fund administrators.  In fact, the Sham Clients received no payments from AlphaPlus.

54.     When distribution fund administrators sought clarification or additional information regarding the submitted claims, they typically contacted Punturieri via the Delfino alias email address.  Generally, before responding to such inquiries, Punturieri solicited input

from Cammarata and Cohen regarding how to respond to the inquiry received or for assistance in fabricating records to provide to the administrator.

55.    Usually, Cammarata and Cohen provided Punturieri with false explanations, information, and documentation to provide to distribution fund administrators in response to their inquiries.  Then, Punturieri, using the Delfino alias email account, communicated the false explanations and provided the false documentation to distribution fund administrators.

56.    In other instances, Punturieri, using the Delfino alias email account, or Cohen, using the Knolls alias email account, would forward an email from an administrator to Cammarata's email account at SpeedRoute.  Cammarata, acting as the CEO of SpeedRoute, would respond, and Punturieri or Cohen would then forward the response on to the administrator, thereby creating the false impression that an independent broker-dealer had answered the distribution fund administrator's inquiry.

57.    Defendants attempted to respond quickly to inquiries from distribution fund administrators and to follow-up with the administrators to confirm that the administrators had accepted Defendants' false documents and phony explanations.

58.    When Defendants failed to follow-up quickly, Cammarata became concerned. For example, on March 12, 2015, Cammarata, upset that Punturieri had taken too long to respond to a distribution fund administrator, emailed Punturieri, writing:  "Hi Dave, I didn't have your Paul email when I woke up in the middle of the night thinking about JAIL, because we waited a week to hear anything from the admin."  (emphasis in original).

59.    When necessary, Defendants urged distribution fund administrators to speak with Cammarata concerning their questions about the securities trading records submitted in the names of the Sham Clients.  Defendants did not disclose the full extent of Cammarata's

association with, interest in, and control over AlphaPlus and the Sham Clients.  As CEO of

SpeedRoute and a control person of Levelx (formerly Gentem), Cammarata appeared to

distribution fund administrators to be independent.  However, Cammarata provided and/or

verified false documents and information to distribution fund administrators in support of fake

claims submitted by AlphaPlus in the names of the Sham Clients.

60.     In furtherance of Defendants' deception, Cammarata provided, directly or

indirectly, false documents to distribution fund administrators that Defendants had fabricated to

appear as though the documents had been generated by certain brokers, including Speedroute, its

predecessor OES, ETC, and Gentem.

61.     In addition to creating and submitting phony documents and lying, the Individual

Defendants engaged in other deceptive conduct to fool distribution fund administrators.

62.     For example, Defendants created and controlled phony email accounts, which

they used to impersonate a named director of Quartis and a named director of Nimello in

communications with distribution fund administrators.

63.     Similarly, in a phone call on January 5, 2021, Cohen spoke with a distribution

fund administrator and impersonated an individual who is a named director of Nimello.

64.     In defrauding the distribution fund administrators, Defendants effectively stole

money intended for victims of the underlying securities frauds.

65.     Distribution fund administrators liquidated money market funds (or other

sources), in whole or in part, to pay approved distributions, including distributions paid to

AlphaPlus by check for the benefit of the Sham Clients, which were premised on Defendants'

false claims.

14

66.     AlphaPlus collected payments in excess of $40 million from distribution fund administrators as a result of the phony claims submitted in the names of the Sham Clients.

67.     However, AlphaPlus did not transfer the funds it received to the Sham Clients. Instead, the funds were transferred to accounts in the names of the Individual Defendants or entities controlled by the Individual Defendants, including among other entities, Quartis NJ and Nimello NJ.  Subsequently, the Individual Defendants used the funds for their own benefit, purchasing items like jewelry, cars, home renovations, watercraft, vacation homes and other real estate, including upkeep on Cammarata's personal Caribbean island.

**D.     Examples**

### 1.   AgFeed Industries, Inc. Securities Class Action

68.     In December 2014, in connection with a distribution fund arising from *Blitz v. AgFeed Industries, Inc.*, No. 11-cv-0992 (M.D. Tenn.), AlphaPlus submitted claims to the distribution fund administrator ("Administrator 1") on behalf of Quartis falsely reporting that Quartis made more than 8,000 trades to purchase securities of AgFeed Industries, Inc. ("AgFeed").

69.     After evaluating the initial claim submission, on February 26, 2015, Administrator 1 requested a trade confirmation for one of Quartis's claimed trades in AgFeed. About two weeks later, on March 11, 2015, Punturieri, using the Delfino alias, provided a document purporting to be a brokerage confirmation from OES.  The brokerage confirmation that Punturieri sent Administrator 1 was not genuine.  It was fabricated by Defendants.

70.     In June 2015, AlphaPlus submitted another set of claimed securities transactions in AgFeed securities to Administrator 1, this time in the name of Nimello.  Defendants falsely claimed that Nimello had made more than 16,000 transactions to purchase AgFeed securities during the relevant period.

71.     Later that month, on June 17 and 22, Administrator 1 emailed Punturieri, at the Delfino alias email account, with background questions on Nimello, such as whether SpeedRoute is the actual custodian for the fund.  On June 22, 2015, Punturieri, using the Defino alias email account, forwarded the questions from Administrator 1 to Cammarata and Cohen.  Later that day, Cammarata responded:  "Ok, This is going to be tougher than I thought."

72.     On June 24, 2015, Cammarata emailed proposed responses to the questions posed by Administrator 1 to Punturieri, at the Delfino alias email account.  In his email, Cammarata included a statement indicating that while SpeedRoute is the executing broker, Industrial and Commercial Bank of China ("ICBC") is the clearing/custody firm for Nimello.  Punturieri, using the Delfino alias email account, forwarded Cammarata's email to Cohen.  Subsequently, Punturieri, using the Delfino alias email account, sent the responses provided by Cammarata to Administrator 1.  None of this was true.  In reality, neither SpeedRoute nor ICBC provided any brokerage services to Nimello.

73.     On June 25, 2015, Punturieri, using the Delfino alias email account, provided Administrator 1 with purported brokerage statements generated by SpeedRoute and OES showing Nimello's trading in AgFeed.  However, these were fabricated by Defendants.

74.     On June 29, 2015, Administrator 1 emailed Punturieri, at the Delfino alias email address, indicating that Administrator 1 also wanted to see documentation generated by ICBC due to the prior representation that ICBC is the custodian for Nimello.  Punturieri forwarded the email to Cammarata and Cohen and stated "Joe read below and give us a call when you can…" Later that day, Punturieri responded to Administrator 1 and suggested that Administrator 1 contact "Joe at Speedroute" and provided Cammarata's phone number.

75.     On July 13, 2015, Administrator 1 emailed Punturieri, at the Delfino alias email account, asking whether Nimello had been able to obtain documentation from its custodian. Punturieri forwarded the email to Cammarata and Cohen and stated, "Obviously the answer is no but what would you like for me to say in response?"

76.     Cammarata responded to Punturieri and Cohen and included a draft response stating, among other things, that the Nimello trades are flipped by ICBC to ETC, which serves as custodian.

77.     The next day, July 14, 2015, Cohen edited Cammarata's response.  Later that day, Punturieri, using the Delfino alias email account, responded to Administrator 1 with the response prepared by Cammarata and Cohen, and copied Cohen at the Knolls alias email account.  The information Defendants provided to Administrator 1 was false.

78.     On July 16, 2015, using the Delfino alias email account, Punturieri forwarded an email containing an additional question from Administrator 1 to Cammarata and Cohen and asked, "What should I respond to this guy about the docs?"  Cammarata responded, "I will try to call them tonight or today."  Punturieri responded, "Ok…that might be the only way he gets off our back."  Cammarata responded the following day and confirmed that he had spoken to Administrator 1.

79.     On July 21, 2015, using the Delfino alias email account, Punturieri forwarded an email to Cammarata and Cohen he had received from Administrator 1, in which Administrator 1 inquired whether documentation had been obtained from ETC or ICBC.  Cammarata instructed Punturieri to respond that ETC charges a good deal for reports and that Nimello does not bother asking anymore.  Using the Delfino alias account, Punturieri responded to Administrator 1 as

instructed by Cammarata.  However, Defendants knew that ETC provided no actual brokerage services to Nimello.

80.     Administrator 1 replied that they do not need documentation for every trade and that a few will suffice.  Using the Delfino alias account, Punturieri copied the response from Administrator 1 into a separate email, which he sent to Cohen and Cammarata.  Cohen responded, writing:  "Joe – have any pull at ETC?"  Cammarata responded, "Yes, but I need to know exactly what he needs and then can try."  Cohen provided Cammarata with the trades at issue the following day and Cammarata responded, "Can you send me the statements that you guys created for those?"

81.     On July 24, 2015 Punturieri, using the Delfino alias account, emailed Administrator 1 and stated:  "My client spoke to ETC, they are pulling the reports from the archives so as soon as they are ready I will get them over to you."

82.     On July 28, 2015 Cammarata emailed Punturieri, at the Delfino alias email account, and Cohen that obtaining the ETC reports is not looking as easy as he thought.  Several minutes later Cammarata received a position report generated by ETC from a contact at SpeedRoute.  The report received reflected trading by an entity unrelated to Sham Clients or Defendants.

83.     Defendants decided to use this model report to falsify records.  Cammarata forwarded the report to Cohen and Punturieri, at the Delfino alias email account, and asked: "This is a position report I have for ETC, can we make one look like this and I ask them to approve it?"  Cohen responded, "I can try Thursday – Paul – can you try to get the excel part matched? Colors etc?"  Punturieri, using the Delfino alias, responded, "I'm sure we can get real close but this would have to get massaged 99%."

84.     Later in the day, Cohen emailed Cammarata and Punturieri, at the Delfino alias email account, and stated, "Joe – we need a sample of a transaction report – then we can duplicate it, not an issue.  Position report doesn't help us."  Cammarata then emailed a contact at SpeedRoute and asked the individual to pull a sample transaction report instead and send it to Cohen.

85.     Cammarata's contact at SpeedRoute emailed the requested report to Cohen under separate cover, who forwarded it on to Punturieri, at the Delfino alias email account.  The report included securities trades done by Tillerman Securities, Ltd. ("Tillerman"), which was a customer of ETC and unrelated to the Sham Clients.

86.     The following day, July 29, 2015, using the Delfino alias email account, Punturieri sent Cohen a black and white version of the report provided by the contact at SpeedRoute to which Cohen responded, "That's perfect."

87.     On July 31, 2015, using the Delfino alias email account, Punturieri emailed Administrator 1 and stated that an employee at ETC had assisted in providing the reports.

88.     On August 5, 2015, Cammarata emailed Cohen and stated, "Hi Erik, As we discussed and I discussed with [Grant] from the administrator, Nimello trades in omnibus account because they trade through a Bahamian Broker Dealer, Tillerman that clears and custodies at ETC."  Cohen forwarded the message to Punturieri, at the Delfino alias email account.

89.     Approximately four minutes later, Punturieri emailed Administrator 1 an account activity report purportedly generated by ETC and an explanation of Nimello's trading relationships similar to that authored by Cammarata, which Punturieri represented had been authored by SpeedRoute.  The attached report still contained Tillerman's name, but the trading

data had been changed to include, among other things, phony trades in AgFeed securities that Defendants attributed to Nimello.

90.     On August 31, 2015, Administrator 1 advised Punturieri, at the Delfino alias email account, that Administrator 1 would be issuing checks relating to the claims made by Quartis and Nimello for the AgFeed settlement.

91.     From August 20, 2015 to September 22, 2015, checks issued by distribution fund administrators for the benefit of Quartis in the amount of $501,595.42 were deposited into the AlphaPlus bank account at Bank 1.  This amount included checks totaling $121,921.52 issued by Administrator 1 in payment of claims made by Quartis in connection with the AgFeed class action distribution.

92.     Defendants bundled the payments received in connection with their phony claims regarding trading in AgFeed securities and transferred the funds through Quartis NJ and Nimello NJ to other entities the Individual Defendants controlled.  From September 2, 2015 through September 28, 2015, transfers totaling $524,379.57 were made from the AlphaPlus bank account at Bank 1 to the Quartis NJ bank account at Bank 1.  No other deposits were recorded in the Quartis NJ bank account at Bank 1 from September 2, 2015 through October 8, 2015.

93.     From September 2, 2015 through October 8, 2015, payments totaling $266,130.94 were made from the Quartis NJ bank account at Bank 1 to PB Trade, an entity owned by Cammarata; $128,119.41 to WOT Trading, an entity owned by Cohen; and $128,031.69 to ADP Consulting, an entity owned by Punturieri.

94.     From August 20, 2015 to September 22, 2015, checks issued by settlement administrators for the benefit of Nimello in the amount of $350,242.65 were deposited into the AlphaPlus bank account at Bank 1.  This amount included checks deposited on September 2,

2015 totaling $246,940.43 issued by Administrator 1 in payment of claims made by Nimello in connection with the AgFeed class action distribution.

95.     From September 2, 2015 through October 8, 2015, transfers totaling $350,242.65 were made from the AlphaPlus bank account at Bank 1 to the Nimello NJ bank account at Bank 1.

96.     From September 2, 2015 through October 8, 2015 payments totaling $93,071.20 were made from the Nimello NJ bank account at Bank 1 to PB Trade, an entity owned by Cammarata; $90,889.24 to WOT Trading, an entity owned by Cohen; and $90,889.24 to ADP Consulting, an entity owned by Punturieri.

97.     Defendants did not transfer any of the money received from AgFeed distribution fund to Quartis or Nimello.

### 2.   B.P. PLC Fair Fund

98.     In 2012, an SEC enforcement action, *Securities and Exchange Commission v. BP P.L.C.*, 2:12-CV-02774 (E.D. La.), settled in district court.  In February 2014, the Court appointed "Administrator 2" to oversee the distribution of the Fair Fund created pursuant to Section 308(a) of the Sarbanes-Oxley Act, as amended, to the victims of the fraud ("BP Distribution Fund").  The BP Distribution Fund was held in escrow and invested in the Federated Hermes U.S. Treasury Cash Reserves Fund (UTIXX), a publicly traded money market fund.

99.     On September 16, 2016, Administrator 2 emailed Punturieri at the Delfino alias email account that Administrator 2 had received the claims submissions for Quartis and Nimello relating to their purported trading in BP P.L.C. ("BP").

100.     On September 19, 2016, Administrator 2 notified Punturieri at the Delfino alias email account that backup documentation was required to be submitted for the purported trades

in BP securities, including all transactions and holdings.  Administrator 2 declined Punturieri's request made to allow AlphaPlus to submit a sample of trades.

101.    On September 21, 2016, using the Delfino alias email account, Punturieri emailed Administrator 2 asking how monthly reports containing thousands of pages should be submitted. Administrator 2 responded that it would accept submission on a CD or via email.  A little over a week later, on September 30, 2016, using the Delfino alias email account, Punturieri emailed Administrator 2 asking "What is the deadline for this.. [sic] clients are working on getting the reports"[.]

102.    On October 5, 2016, Punturieri forwarded Administrator 2's response to his question concerning the filing deadline to Cohen at his Knolls alias email account.  A few minutes later, Cohen, using his Knolls alias email account, sent to Puturieri at his Delfino alias email account a draft email to Administrator 2 asking whether documentation submitted by a client's broker setting forth client and broker information as well as the relevant trading would be acceptable.

103.    Two minutes later, Punturieri, using the Delfino alias email account, sent Administrator 2 an email containing the language that he had just received from Cohen.  In response, Administrator 2 suggested that Punturieri send a sample from a broker for Administrator 2 to determine if it would be acceptable.

104.    On October 11, 2016, Cohen, using the Knolls alias email account, sent another draft email to Punturieri at the Delfino alias email account, which attached a sample broker report purportedly generated by OES, and provided an explanation as to how the report was created.

105.    On October 12, 2016, Punturieri, using the Delfino alias email account, sent Administrator 2 an email containing the language that Cohen had sent him the prior day and attaching the sample broker report.  Later that day, Administrator 2 responded to Punturieri's email, stating that "**we can accept this documentation**."  (emphasis in original).  Administrator 2 also confirmed in an email that day to Punturieri at the Delfino alias email account that a similar report could also be used for the holdings.

106.    On November 1, 2016, Punturieri, using the Delfino alias email account, emailed to Administrator 2 position and transaction reports purportedly generated by OES falsely reflecting trading by Quartis and Nimello in BP.   The transaction reports for Quartis and Nimello included 139 and 149 pages, respectively, of trades purportedly executed in securities issued by BP during the relevant time period.  Defendants knew, or were reckless in not knowing, that Quartis and Nimello had not engaged in those trades, and those transaction reports contained false information.

107.    Based on the false information and documentation submitted by Defendants, Administrator 2 approved the claims submitted in the names of Quartis and Nimello for payment.  Subsequently, Administrator 2 liquidated the money market fund in which the settlement proceeds had been held in escrow and made distributions.

108.    On September 20 and 21, 2018, AlphaPlus deposited checks into its bank account at Bank 1 in the amounts of $153,801.24 and $1,793.00 issued for the benefit of Quartis and Nimello, respectively.  Thereafter, using funds received from distribution fund administrators throughout the month, AlphaPlus issued from its bank account at Bank 1 one check each to PB Trade (Cammarata), WOT Trading (Cohen), and Andena Tech (Punturieri) in the amounts of

$258,448.80, $154,778.33, and $205,499.66, respectively.  All of these checks were dated September 24, 2018 and referenced "Sept 2018."

### 3.   American Apparel, Inc. Securities Class Action

109.   The securities class action, *In re American Apparel, Inc. Shareholder Litigation*, No. 10-cv-6352 (C.D. Cal.), settled in district court on January 17, 2014.  Pursuant to the settlement agreement, a distribution fund was created to distribute the proceeds of the settlement to the victims of the fraud – anyone who purchased securities in American Apparel during the relevant time period.

110.   A distribution fund administrator ("Administrator 3") was appointed, and the stipulation of settlement provided that the settlement funds were to be escrowed in instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or Agency thereof, including, among other investments, U.S. Treasury Bills or a U.S. Treasury Money Market Fund.

111.   In May 2014, Administrator 3 solicited claims for compensation from the American Apparel distribution fund, by asking purchasers of securities of American Apparel to submit their claimed losses from trading in the securities of American Apparel during the relevant period and proof of their securities transactions during that period.

112.   On December 8, 2014, AlphaPlus submitted a claim in the name of Quartis. Punturieri, using the Delfino alias email account, emailed to Administrator 3 a spreadsheet containing more than 7,500 purported purchases of American Apparel's securities, more than 5,000 of which Defendants attributed to Quartis.

113.   Quartis made no such trades.

114.    Individual Defendants subsequently provided additional false information to Administrator 3 in response to questions directed to AlphaPlus regarding the claim submission made on behalf of Quartis.

115.    For example, on January 26, 2015, Administrator 3 emailed Punturieri at the Delfino alias email account, identifying several trades that AlphaPlus had claimed Quartis had made, but for which the claimed prices of the trade were not within the range of the price at which American Apparel securities had been trading on the dates of the claimed trades.

116.    In response to this email, the Individual Defendants created a chain of emails to deceive Administrator 3.  Using the Delfino alias email account, Punturieri forwarded Administrator 3's email to an email address that appeared to be in the name of an individual identified as a director of Quartis, but was actually controlled by the Individual Defendants. Punturieri's email asked:  "Can you answer the claims admin's question?"

117.    That fake director email address responded to Punturieri at the Delfino alias account, copied Cammarata at his SpeedRoute email address, joe@SpeedRoute.com, and asked whether Cammarata could assist with Administrator 3's question.

118.    After sending a draft response to Cohen (at his personal email address) and Punturieri (at the Delfino alias email address), Cammarata then responded to the fake director email address, stating that the trades were limit order trades placed on one day, but executed the following day when the prices dropped.  Cammarata's email provided false information; Quartis never conducted the purported trading at all.

119.    By using his SpeedRoute account, Cammarata appeared to be an independent broker—not an individual who, along with Cohen and Punturieri, controlled AlphaPlus and Quartis.  Punturieri, using the Delfino alias email account, forwarded the email chain to

Administrator 3 stating "Please see below for my clients answer [sic] .. let me know if you need any further info.."  This entire chain was intended to deceive Administrator 3 into believing Quartis had consulted with its broker and there was a rational explanation for the apparent price discrepancy.  But all of this was false.

120.    The Individual Defendants also used Cammarata's position at SpeedRoute to generate false trading records to attempt to substantiate the purported Quartis trading in American Apparel.

121.    On June 10, 2015, Administrator 3 emailed Punturieri at the Delfino alias email account, copying Cohen via the Knolls alias email account, with a sampling of trades in four class actions, including the American Apparel class action.  Administrator 3 requested that AlphaPlus provide documentation to support the transactions in conjunction with an audit of Quartis's trades.

122.    Using the Delfino alias email account, Punturieri forwarded Administrator 3's email to Cammarata's and Cohen's personal email accounts, stating:  "We got the list from [the administrator] for [Q]uartis.  Two of the tabs have some big holdings… We have 2 weeks to get this back to them."  Cohen replied, "OK we will review on Friday."

123.    On June 15, 2015, using the Delfino alias email account and copying Cohen via the Knolls alias email account, Punturieri emailed Administrator 3 fake position and trade reports purportedly generated by OES for Quartis for the American Apparel securities trades identified by Administrator 3.

124.    The fake position report was dated "5/6/2010" although the trade report stated that it reflected trading by Quartis in American Apparel from "6/10/2010" to "6/16/2010"—a month after the date of the report.

125.    A little more than a week later, on June 23, Administrator 3 responded, pointing out that the previously provided position report was as of "5/6/2010," but that Administrator 3 had requested the information as of "11/15/2010."  A short while later Delfino responded to Administrator 3, attaching a second position report now dated "11/5/2010."  However, this position report contained the exact same values for quantity, market price, and market value as had been listed on the position report previously provided.

126.    Defendants created the phony position report on fabricated letterhead made to appear as if they were created by OES, the predecessor broker-dealer to SpeedRoute.

127.    Subsequently, on June 25, 2015, the administrator emailed Punturieri and Cohen, at the Delfino alias and Knolls alias email accounts, that the Quartis documentation had been "reviewed and approved" and eligibility for a distribution from the American Apparel distribution fund had been restored.

128.    Several months later, Defendants caused AlphaPlus to submit a fraudulent claim in the name of Nimello, reporting that Nimello had made more than 1,500 trades in purchasing American Apparel securities during the relevant period.  However, Nimello did not make the trades that Defendants claimed in their submission.

129.    On December 2, 2015, Punturieri, using the Delfino alias account, emailed a spreadsheet of phony trades purportedly made by Nimello to Administrator 3.

130.    On December 24, 2015, Administrator 3 emailed Punturieri, at the Delfino alias email account, requesting that AlphaPlus provide documentation to support the purported transactions by Nimello in American Apparel and certain other securities.

131.    Four days later, on December 28, 2015, using the Delfino alias account, Punturieri emailed Administrator 3 various documents that purportedly supported the claim, including a

27

Proof of Claim form and a trade letter attesting to the truth and accuracy of the trading data provided.

132.    Defendants had created these documents and they knew that the information in them was false: Nimello did not actually make the claimed trades in American Apparel securities.

133.    In three separate emails on January 4, 2016, using the Delfino alias account, Punturieri emailed fraudulent trade and position reports for Nimello, which were on letterhead Defendants had fabricated to appear as if it came from SpeedRoute and OES, to Administrator 3.

134.    Based on the fraudulent information and the falsified backup documentation submitted by Defendants, Administrator 3 approved the claims on behalf of Quartis and Nimello.

135.    On behalf of Quartis and Nimello, AlphaPlus received checks from Administrator 3 in the amounts of $63,159.84 and $75,190.53, respectively, from the American Apparel distribution fund.  The checks reflected the amounts determined by Administrator 3 to be due to Quartis and Nimelo as a result of the fraudulent claim submissions made by the Defendants.

136.    These funds were deposited into an AlphaPlus account on October 26, 2016.  At or around the end of the month, these fraudulently obtained funds and other monies were transferred to other entities controlled by Cammarata, Cohen, and Punturieri.  None of the money was transferred to Quartis or Nimello.

### 4.    Penn West Petroleum Securities Class Action

137.    In 2016, the securities class action, *In re Penn West Petroleum Ltd. Shareholder Litigation*, No. 14-cv-6046 (S.D.N.Y.), settled in district court.

138.    Pursuant to the terms of the settlement agreement, a distribution fund was created and "Administrator 1," the same administrator in the AgFeed matter, was appointed to handle the distribution.  The stipulation and agreement of settlement provided that, except as otherwise

stated, the funds would be escrowed in United States Treasury Bills or a mutual fund invested solely in such instruments until they were distributed.

139.    In June 2016, Administrator 1 solicited investors who had transacted in Penn West securities during the relevant period to submit claims for compensation from the distribution fund.

140.    In or around early September 2016, AlphaPlus submitted claims on behalf of Quartis and Nimello reporting that they collectively made more than 14,000 transactions to purchase Penn West securities during the relevant period.  On September 8, 2016, Administrator 1 acknowledged receipt of this claim.

141.    On May 10, 2018, Administrator 1 emailed Punturieri at the Delfino alias email account, requesting supporting documentation for transactions submitted on behalf of Nimello. Following several follow up emails requesting the documentation, on June 14, 2018, using the Delfino alias email account, Punturieri emailed Administrator 1 stating:  "Position reports will be coming your way shortly."  Defendants then worked together to fabricate those position reports.

142.    That same day, June 14, 2018, Punturieri and Cohen discussed fabricating fake trade documentation.  Using the Delfino alias email account, Punturieri emailed Cohen's Knolls alias email account and Cohen's personal email account, asking: "Can you create these position repoprts [sic] today please[?]"  Cohen replied from his personal email account:  "Sure when I get back."

143.    Later that day, using the Delfino alias email account, Punturieri emailed Administrator 1 the falsified position reports on fabricated letterhead made to appear as if generated by SpeedRoute, for the phony Nimello trades in Penn West securities.

144.    Two weeks later, on June 28, 2018, using the Delfino alias email account, Punturieri emailed Administrator 1 false trade reports for Nimello, which were also on fabricated SpeedRoute letterhead.

145.    Based on the false information and documentation submitted by Defendants, Administrator 1 approved the claims Defendants submitted in the names of Quartis and Nimello.

146.    On November 2, 2018, AlphaPlus deposited checks in the amount of $18,632.37 and $114,536.11 issued for the benefit of Quartis and Nimello, respectively.  Thereafter, AlphaPlus issued one check each to Andena Tech, an entity owned by Punturieri, and WOT Trading, an entity owned by Cohen; and two checks to Present Six, an entity owned by Cohen, all of which contained "Nov 2018" in the memo field.  None of the money was transferred to Quartis or Nimello.

### 5.   Endochoice Holdings, Inc. Class Action

147.    In 2020, the securities class action, *In re Endochoice Holdings, Inc. Securities Litigation*, No. 2016-cv-277772 (Sup. Ct. GA), settled in Georgia state court, and a distribution fund was established.

148.    The stipulation of settlement provided that the settlement funds were to be escrowed in United States agency or Treasury securities or other instruments backed by the full faith and credit of the United States or agency thereof, or fully insured by the United States Government or agency thereof.

149.    On October 7, 2020, using the Delfino alias email account, Punturieri submitted a claim to a distribution fund administrator ("Administrator 4") on behalf of Invergasa falsely reporting that Invergasa had traded in Endochoice securities.  The submission falsely indicated that during the relevant time period Invergasa had executed 606 trades in Endochoice securities.

150.     On October 20, 2020, Administrator 4 notified Punturieri, at the Delfino alias email account, that the claim entered on behalf of Invergasa for purported trading in Endochoice had been selected for audit; and, therefore, AlphaPlus was required to provide supporting documentation for two trades.  Administrator 4 noted that acceptable documents could include broker statements, clearing house blotters or other independent, third-party verification, and/or confirmation of the transactions.

151.     On December 11, 2020 Cammarata emailed Administrator 4 and attached a document containing responses to questions previously posed regarding Invergasa.  Cammarata indicated that Invergasa was presently a client of Levelx and that Levelx's predecessor, Gentem, had generated a document provided to Administrator 4 indicating that Invergasa had traded in Endochoice securities.  Later that same day, Administrator 4 sent an email to Cammarata attaching documents purportedly generated by Gentem that had been previously submitted by AlphaPlus as part of the claim made on behalf of Invergasa.  However, a listing of active and closed Gentem accounts compiled in November 2019 does not contain the Invergasa account number listed on the documents purportedly generated by Gentem.  Moreover, the dates of the Invergasa account statements submitted in support of the claim predate the September 2018 name change filed with a Colombian agency of "M Gomez Consulting Ltda" to Invergasa. Invergasas did not make the claimed Gemtem trades.

152.     On December 15, 2020, Cammarata emailed Administrator 4 as a spokesman for the brokers and confirmed that the number of trades matched internal records controlled by the successor to Gentem, Levelx, and that 25 trades had been spot checked.  With respect to Administrator 4's request for trade confirmations, Cammarata stated:  "Unfortunately, I do not have that data, all I can tell you is that the transactions you sent, appear to have all been executed

by the client, but the client themselves would have to request the confirm from the clearing firm and they don't really know which clearing firm it even was a [sic] the time."  Cammarata's representations were false.

153.    Administrator 4 rejected Defendants' claims submitted in the name of Invergasa, and Defendants have not received a distribution in connection with their claims concerning Endochoice securities trades.

**E.    Defendants Violated the Anti-Fraud Provisions of the Federal Securities Laws**

154.    During the relevant period, the Individual Defendants controlled AlphaPlus.

155.    AlphaPlus acted by and through its agents, the Individual Defendants.

156.    During the relevant period, the Defendants perpetrated a scheme to defraud distribution fund administrators and steal funds intended for victims of securities frauds.

157.    Defendants engaged in deceptive conduct including, but not limited to, creating false identities, concealing the extent of their affiliations with AlphaPlus and the Sham Clients, and fabricating broker-dealer letterhead that they used to falsify brokerage records, and trade and position reports in support of fake claims.

158.    All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material.  Defendants deceived the distribution fund administrators by creating and submitting false claims, fabricated trading records, and fraudulent documents from false identities that Defendants created to further their fraud and mask their own wrongdoing.

159.    The Individual Defendants acted knowingly and/or recklessly.  Among other things, the Individual Defendants knew or were reckless in not knowing that they were engaging in deceptive conduct and making material misrepresentations and omitting material facts in connection with selling or offering of securities.  Each was aware that the trades they were submitting were not actually made by the entities in whose name Defendants submitted the

claims, and each was aware that they were taking the proceeds of the fraudulent claims for their own purposes.

160.    The Individual Defendants and AlphaPlus, by and through the Individual Defendants, had ultimate authority for false and misleading statements and omissions made orally and in writing.  Each of the Individual Defendants made material misstatements directly to distribution fund administrators.

161.    Through this scheme, Defendants employed a device, scheme or artifice to defraud and engaged in acts, transactions or courses of business that operated as a fraud or deceit upon the distribution fund administrators.

162.    In perpetrating their scheme, Defendants used the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange.

163.    The conduct described herein was in connection with the purchase or sale of securities.

164.    In addition, Cammarata, Cohen, and Punturieri knowingly provided substantial assistance in connection with AlphaPlus's violations of the federal securities laws.

### CLAIMS

### FIRST CLAIM FOR RELIEF
**Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

165.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 164 inclusive, as if they were fully set forth herein.

166.    By engaging in the conduct described above, starting in at least 2014 Defendants directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, in connection with the purchase and sale of securities, knowingly or recklessly:

33

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

167.    By reason of the foregoing, Defendants, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**Cammarata, Cohen, and Punturieri Aided and Abetted AlphaPlus Corp.'s and Alpha Plus LLC's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

168.    The Commission re-alleges and incorporates be reference each and every allegation in paragraphs 1 through 167 inclusive, as if they were fully set forth herein.

169.    As described above, AlphaPlus Corp. and Alpha Plus LLC violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

170.    Defendants Cammarata, Cohen, and Punturieri knowingly or recklessly provided substantial assistance to AlphaPlus Corp. and Alpha Plus LLC in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

171.    By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Cammarata, Cohen, and Punturieri aided and abetted AlphaPlus Corp.'s and Alpha Plus LLC's violations and, unless restrained and enjoined, will in the future aid and abet violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Ordering Defendants to disgorge all ill-gotten gains with prejudgment interest, to effect the remedial purposes of the federal securities laws;

**III.**

Ordering Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Ordering that Defendant Cammarata is barred from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Granting such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Respectfully submitted,


By:  s/ John V. Donnelly III

John V. Donnelly III, Esq.
Scott A. Thompson, Esq.
Julia C. Green, Esq.
Suzanne C. Abt, Esq.
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
Email:  DonnellyJ@sec.gov


Jennifer C. Barry, Esq.
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071
Telephone:  (323) 965-3998
Facsimile:  (213) 443-1904
Email:  BarryJ@sec.gov


**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**


Dated:  November 3, 2021