IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | CIVIL ACTION |
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No.   21-cv-4845 |
| | : | |
| CAMMARATA, et al., | : | |
| *Defendants.* | : | |

**MEMORANDUM**

**August 31, 2023**

### I.   INTRODUCTION

The United States Securities and Exchange Commission (the "Commission") seeks summary judgment as to the liability of Defendant Joseph Cammarata ("Cammarata") for: (1) violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b) (Count I); and (2) violating Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) (Count II). For the reasons set forth below, the Court will grant the Commission's Motion and enter judgment against Cammarata as to his liability on Counts I and II.

### II.   BACKGROUND

Collateral estoppel looms large in this case and, accordingly, the facts are largely drawn from the record in the parallel criminal case, *United States v. Cammarata*, No. 21-CR-427-CFK (E.D. Pa.) ("Criminal Case"). The Court notes that there is substantial overlap between the evidence submitted in the criminal trial and the nearly 900 pages of evidence submitted with the Commission's motion (including trial transcripts). Cammarata points to no additional evidence.

## A.  Key Individuals and Entities

Cammarata is a seasoned securities professional who spent approximately three decades in the brokerage business. Oct. 25, 2022 Crim. Tr. 111:21–25. Since approximately 1991, he has: (1) been a trader; (2) worked at brokerage firm; (3) owned brokerage firms; and (4) sold trading technology to brokerage firms. *Id.* at 12:1, 13:19–20, 112:2–11. To name just a few of Cammarata's legitimate accomplishments, he: (1) was the head trader of the fourth-largest online brokerage firm (*id.* at 13:23–25); (2) founded a trading company to develop a system that aided some of the largest broker-dealers in aggregating market data (*id.* at 14:7–8, 15:14–16); (3) was the youngest Managing Director of The Bank of New York (*id.* at 20:8–9, 20:18–19); and (4) sold his trading technology for $31 million (*id.* at 44:1–5). Suffice it to say, Cammarata understands the securities market, and the relevant laws and regulations governing it, all too well. *See id.* at 111:13–21.

Erik Cohen ("Cohen") met Cammarata in the early 2000s and the two went into business together in approximately 2008.  Oct. 20, 2022 Crim. Tr. at 203:10–204:9. The two worked together on several ventures; most notably, they were partners at AlphaPlus. *Id.* at 197:14–18. Cohen's background is in technology assistance. Oct. 25, 2022 Crim. Tr. at 23:2 –24:6.  Cohen also used the alias "Eric Knowles" during the course of the scheme (described *infra*). *Id.* at 203:3–4.

David Punturieri[1] ("Punturieri") met Cammarata in 2009 when Cammarata hired him to perform administrative and operational work. Oct.  25, 2022 Crim. Tr. at 31:10–32:1. Punturieri

---

[1]      Collectively, Cammarata, Cohen, and Punturieri are referred to as "Defendants."

was also a partner at AlphaPlus. Oct. 20, 2022 Crim. Tr.. at 197:14–18. Punturieri used the alias "Paul Delfino" during the course of the scheme.[2] Oct. 20, 2022 Crim. Tr. at 203:5–6.

AlphaPlus was founded in approximately 2014 and, in relevant part, was owned and operated by Cammarata, Cohen, and Punturieri. Oct. 25, 2022 Crim. Tr. at 47:11–50:3. AlphaPlus is a securities class action settlement recovery service, also referred to as a claims aggregator, meaning that it assisted clients in collecting proceeds recovered in connection with securities class actions or enforcement actions brought by the Commission. *See* Oct. 20, 2022 Crim. Tr. at 197:23–199:16. Cammarata's industry expertise was pivotal to AlphaPlus' success. Oct. 25, 2022 Crim. Tr. at 51:9–52:12.

Quartis Trade & Invest Inc.[3] ("Quartis"), Nimello Holdings Limited[4] ("Nimello"), and Inversiones Invergasa[5] SAS ("Invergasa") (collectively, "Sham Clients") are off-shore shell companies—they never engaged in any business and, importantly, they never made any securities trades. Oct. 20, 2022 Crim. Tr. at 217:10–219:7, 239:7–240:10; Oct. 19, 2022 Crim. Tr. at 137:11–17; 140:2–13. Defendants acquired or controlled the Sham Clients because they were foreign entities that were in existence when the relevant trades (upon which they made claims) were made. *See, e.g.*, Oct. 20, 2022 Crim. Tr. at 217:10–219:7. Despite their shared ownership, the Sham Clients purported to be independent clients of AlphaPlus. *Id.* By submitting claims on behalf of

---

[2]     Cammarata also called Punturieri "little brother" because Punturieri was prone to making mistakes. Oct. 24, 2022 Crim. Tr. at 14:14–21.
[3]     Steven Dickenson played the role of Quartis' Director. Oct. 19, 2022 Crim. Tr. at 135:23–136:1.
[4]     Todd Callender was "the client" for Nimello. Oct. 19, 2022 Crim. Tr. at 153:1–7.
[5]     Juan Pablo Gomez stood in as the client for Invergasa. Oct. 20, 2022 Crim. Tr. at 239:9–12.

3

the Sham Clients through AlphaPlus, Cammarata, Cohen, and Punturieri collectively received approximately $40 million in settlement proceeds.

SpeedRoute LLC ("SpeedRoute") is a registered broker-dealer and, from 2010 to 2018, Cammarata was its President and CEO. SpeedRoute is a conduit for its clients; it fills orders in the market in its own name, on a fully disclosed basis,[6] but it does so on behalf of its clients and "never" on behalf of SpeedRoute. Oct. 21, 2022 Crim. Tr. at 265:6–24; *see also* Oct. 20, 2022 Crim. Tr. 23:2–28:7, 30:5–17, 34:3–42:25. In other words, SpeedRoute does not hold positions in securities for itself. *See* Oct. 20, 2022 Crim. Tr. 7:10–15:22. SpeedRoute is "an agency-only broker-dealer" meaning that it "only services broker-dealer clients" rather than individual clients. Oct. 21, 2022 Crim. Tr. at 265:6–24. The trades SpeedRoute facilitated, on behalf of other large broker-dealers, accounted for approximately one percent of trades made on the market each day. *Id.* at 215:16–21. Accordingly, SpeedRoute clients were likely to be implicated in every major securities class action and be entitled to proceeds of related settlement awards. *Id.* Quartis, Nimello, and Invergasa were never customers of SpeedRoute. *See, e.g.*, *id.* at 213:23–218:9.

### B.  Claims Process Generally

Following a settlement in a securities class action or an enforcement action brought by the Commission, a settlement fund is set aside for distribution to those investors who made qualifying trades during the class period. Oct. 19, 2022 Crim. Tr. at 57:9–58:25; Oct. 20, 2022 Crim. Tr. at

---

[6]     Trading on a "fully disclosed basis" means that the beneficial owner of the underlying trade is known and disclosed to the clearing firm. Conversely, an "omnibus" trading structure is a situation in which multiple individuals are associated with one account and the clearing firm does not have the underlying information as to which specific individual is benefiting from the trade. *See, e.g.*, Oct. 20., 2022 Crim. Tr. at 16:1–10.

198:10–199:5. The funds are often held, at least in part, in money market funds (*i.e.*, securities[7]). ECF No. 260-7 ¶ 25.  Potential class members submit supporting documentation, such as brokerage statements, to the distribution fund administrator (the "administrator"), which then determines if the investor made a qualifying trade during the class period. The class members can be individuals, or they can be companies such as banks, hedge funds, and pension funds. Oct. 19, 2022 Crim. Tr. at 59:4–13; Oct. 20, 2022 Crim. Tr. at 50:14–52:15. Once a class member has shown that they are entitled to an award from the settlement fund, the administrator will distribute a prorated portion of the settlement fund[8] to the class member based on the percentage of shares the class member held as compared to the total impacted shares. Oct. 19, 2022 Crim. Tr. at 60:12–15; Oct. 20, 2022 Crim. Tr. at 50:14–52:15. The natural consequence of the prorated payments is that if an illegitimate claim is paid out, it lowers the amount of money that is available to be awarded to legitimate class members. Oct. 19, 2022 Crim. Tr. at 103:23–104:2; Oct. 20, 2022 Crim. Tr. at 50:14–51:17.

In some instances, independent third-party institutions, such as claims aggregators, will file claims on behalf of impacted individuals or entities (often large financial institutions that traded in significant volumes). Oct. 19, 2022 Crim. Tr. at 60:16–61:22. In such scenarios, third-party filers handle the many logistics of verifying voluminous claims for major traders with administrators in exchange for a portion of the proceeds or a fee. *See* Oct. 20, 2022 Crim. Tr. at 54:16 –22. This can be a time-consuming endeavor because the administrator must verify the

---

[7]      *See, e.g.*, *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1040–41, n.3 (S.D.N.Y. 1981), *aff'd* 694 F.2d 923 (2d Cir. 1982); *see S.E.C. v. Fife*, 311 F.3d 1, 5, 11 (1st Cir. 2002); *Kenneth Rothschild Tr. v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 999 (C.D. Cal. 2002); *see also United States v. Wosotowsky*, 527 Fed. App'x 207, 211 (3d Cir. 2013).

[8]      If the settlement fund was held in securities, the securities will be liquidated in order to provide the prorated payment. ECF No. 260-7 ¶ 25.

information provided by third-party filers to: (i) ensure that the filer has authorization to submit the claim on behalf of their client; (ii) note the underlying beneficial owner (*i.e.*, the one who has the rights to the underlying shares); (iii) confirm that the trading volume for the specific day is not less than the claim being made[9] (*i.e.*, volume checks); (iv) cross-check that the stock was trading at the purchase price the claimant alleges (*i.e.*, price checks); and (v) collect basic tax forms to ensure that the entity or individual is legitimate. Oct. 19, 2022 Crim. Tr. at 61:6–63:4. Additionally, third-party filers will include an attestation that the trade data they are providing is accurate and that they have permission to submit the claim. *Id.* at 70:7–14; Oct. 20, 2022 Crim. Tr. at 207:13–208:2. These checks and balances are necessary because administrators do not have particularized data as to every single trade made, and by whom, on specific days. Oct. 19, 2022 Crim. Tr. at 72:4–11.

### C.  Defendants Submitted False Claims on Behalf of Sham Clients

As a claims aggregator, AlphaPlus created a system through which it could efficiently file claims on behalf of class members for a percentage of the award (usually ten to thirty percent). Oct. 20, 2022 Crim. Tr. at 199:7–21. To make their efforts worthwhile, AlphaPlus sought out large clients, *i.e.*, entities that traded in large volumes, so as to maximize AlphaPlus' percentage of the award. *Id.* Initially, AlphaPlus operated as a legitimate claims aggregator servicing clients who were entitled to the relevant settlement funds. *Id.* at 211:4–7.

Eventually, however, Cammarata devised a scheme in which AlphaPlus used trade data acquired through SpeedRoute to file fraudulent claims on behalf of the Sham Clients. *Id.* at 214:9– 16.  Though the scheme was technical, it was not necessarily complex: AlphaPlus submitted claims

---

[9]    In other words, if a claim came in for more trades than were actually made on the specific day, it would indicate that the trades were not actually made, and the claim is illegitimate.

to administrators on behalf of the Sham Clients by exploiting SpeedRoute's trade data, falsifying supporting documentation, and role-playing as independent broker-dealers. Indeed, Defendants made claims based upon SpeedRoute's trade data which confirmed that *some* qualifying trades were made via SpeedRoute (though not by the Sham Clients). Administrators could not independently confirm that particular entities or individuals made the specific trades and therefore relied upon independent third parties (such as AlphaPlus) to verify the same. Unbeknownst to the administrators, AlphaPlus was not an independent third party because it was owned and operated by Defendants, who also owned and operated the Sham Clients. Indeed, when administrators sought trade verification or additional information, Defendants or others involved in the scheme pretended to be representatives of the third-party entities by lying, using aliases, creating fake email addresses, or similar. This scheme was both effective and lucrative; between the three Sham Clients, Defendants pocketed over $40 million dollars by way of over 400 class action settlement funds. *Id.* at 234:6–20. Moreover, the proceeds of at least 130 settlement funds were escrowed in securities and subsequently liquidated to pay the Sham Clients' fraudulent claims. ECF No. 260-7 ¶ 25; ECF No. 260-9 ¶¶ 3–4; ECF No. 260-10 ¶¶ 3–4; ECF No. 260-11 ¶¶ 4–7; ECF No. 260-12 ¶¶ 4–5; ECF No. 260-13 ¶¶ 3–6; ECF No. 260-14 ¶¶ 4–7; ECF No. 260-15 ¶¶ 4–6.

The inner workings of the scheme were "by design," and Cammarata was the mastermind. *See, e.g.*, Oct. 20, 2022 Crim. Tr. at 249:10–14. Initially, Cammarata told Cohen and Punturieri that the claims were being filed on his behalf because he "owned" SpeedRoute's trade data in his role as its owner, CEO, and President. *Id.* at 214:20–215:8. However, when Punturieri and Cohen prepared to file the claims, Cammarata instructed them to use the Sham Clients and fabricate the necessary documentation rather than actually filing on his behalf. *See id.* at 215:24–216:24, 218:16–25. Then, notwithstanding that the Sham Clients never made any of the relevant trades (or

ever engaged in trading of any kind), AlphaPlus submitted claims to administrators. *See id.* at 217:2–7. These claims were accompanied by false securities trading records, fabricated trade data attestation letters, and fake client agreements. *See, e.g.*, *id.* at 215:22–221:13. Once successfully processed, Defendants collected on the claims, received checks from administrators, and split the entire award between those involved.[10] *Id.* at 223:25–224:9; 224:14–226:1.

Defendants, including Cammarata, had been in the claim aggregation business for years, and they knew the information that administrators might request. *See id.* at 230:20–24. Indeed, Cammarata used his industry expertise to carefully choreograph the scheme. *Id.* at 231:3–9 ("Anything besides a basic question would be sent to [Cammarata] for his response . . . [t]ypically, [Cammarata] would draft a response, and then [Punturieri] or [Cohen] would send it along to the claims administrators."). For example, Cammarata knew that administrators would have more difficulty verifying foreign entities—thus, Defendants selected overseas companies as the Sham Clients. *Id.* at 232:17–22. Cammarata even went so far as to identify individuals to play the role of "clients" who could speak with administrators to the extent necessary. *Id.* at 219:13–25. However, when administrators requested to connect with the client, those individuals were not actually looped in. Instead, Defendants created and used fake email addresses to pose as the "client" when communicating with administrators.[11] *See id.* at 254:11–25. Cammarata also directed Defendants to create fake websites for the Sham Clients to bolster their legitimacy and fend off suspicions. *See, e.g.*, Oct. 20, 2022 Crim. Tr. at 231:16–24. Most crucially, Cammarata

---

[10]  There was no need to collect only a portion of the award because there was no real client to whom the majority of the award should be distributed.

[11]  Indeed, Steven Dickenson (the purported "director" of Nimello) testified at trial that he never used the email address at issue, never received the relevant correspondence, and never wrote the emails supposedly sent by him. Oct. 19, 2022 Crim. Tr. at 142:6–144:15.

used his control over broker-dealers (SpeedRoute and Levelx[12]) to masquerade as an independent third party that could verify the Sham Client's purported trades. *Id.* at 248:23–249:20. Indeed, Cammarata made phone calls to administrators to validate the Sham Clients' claims. ECF No. 260-5 at 27, 40. In sum, Cammarata wove a technical web of lies based on his industry expertise that took many years to untangle. [13]

### D.  The Scheme Unravels

Despite Cammarata's carefully laid plans, administrators eventually caught on. Indeed, two different entities investigated the Sham Clients' claims, determined that they were fraudulent, and reached out to law enforcement. Cammarata, as a self-proclaimed "fixer,"[14] scrambled to find a way out as the walls closed in.

### i.  Strategic Claims

In late 2019, one administrator, Strategic Claims Services ("Strategic Claims"), conducted an audit of AlphaPlus because their submissions were suspicious in several respects. *See* Oct. 19,

---

[12]     Defendants collectively own Levelx Capital LLC, a registered broker-dealer. ECF No. 3 ¶¶ 8–11.

[13]     The above-described misstatements only scratch the surface. For example, Invergasa purported to clear its trades through Cor Clearing—but it did not. Oct. 20, 2022 Crim. Tr. at 19:4–15. Similarly, Nimello and Quartis purported to clear their trades through ICBC, by way of SpeedRoute. Though SpeedRoute was a client of ICBC, it traded on a fully disclosed basis, and, accordingly, ICBC would necessarily have record of Nimello and Quartis as the beneficial owners of the trades. *See* Oct. 20, 2022 Crim. Tr. at 25:12–28:7. ICBC has no such records. *Id.* Moreover, all three Sham Clients also purported to clear through APEX Clearing, via SpeedRoute. APEX did not provide clearing services for SpeedRoute and has no record of the Sham Clients. Oct. 20, 2022 Crim. Tr. at 39:16–40:18. Defendants also listed Cammarata as a contact for ICBC and Apex, though he never worked for either firm. *See, e.g.*, Oct. 20, 2022 Crim. Tr. at 41:24–42:5. AlphaPlus also falsely claimed that Invergasa was a customer of Levelx (or its predecessor) and that Quartis and Nimello were customers of SpeedRoute and OES Market Group. *See, e.g.*, Oct. 21, 2022 Crim. Tr. at 257:21–258:1; 268:12–23; 269:5–11; ECF No. 3. None of these assertions were true, but Cammarata's expertise made them believable.

[14]     *See, e.g.*, Oct. 25, 2022 Crim. Tr. at 11:19–20.

2022 Crim. Tr. at 88:18–21. First, AlphaPlus submitted more claims than any other entity, including major financial institutions. *Id.* at 79:14–80:12. Second, Strategic Claims discovered several instances where the trading volume was higher than average—even impossibly so. *Id.* at 80:23–81:11. Third, the AlphaPlus claims wholly ignored adjustments that should have been made for stock splits—which would normally be reflected in claim submissions. *Id.* at 81:12–20. Fourth, AlphaPlus submitted claims related to an Initial Public Offering ("IPO") that had a negative beginning balance, *i.e.*, a "short" position, which is nearly impossible. *Id.* at 82:1–7. Fifth, the mailing addresses used by both AlphaPlus and the Sham Clients were UPS stores or P.O. boxes— this was highly unusual for major financial institutions. *Id.* at 80:13–22.

Upon review, Strategic Claims determined that the claims submitted by AlphaPlus were likely fraudulent and would be rejected unless AlphaPlus submitted corroborating documents. *Id.* at 82:10–85:22. Though AlphaPlus attempted to provide such information, including by involving Cammarata (posing as a representative of SpeedRoute, ICBC, and APEX[15]), providing trading information for clearing firms that did not exist, and submitting fabricated documents, Strategic Claims was not swayed. *Id.* at 86:12–93:17; 100:4–24. Ultimately, Strategic Claims provided relevant documentation to law enforcement. *Id.* at 103:7–15.

### ii. Dan Dearden's Investigation

In fall 2020, Dan Dearden ("Dearden"), a financial crimes investigator at Computershare, began investigating AlphaPlus. Oct. 20, 2022 Crim. Tr. at 46:15–19; 55:7–14. Dearden oversees any suspicious activity for all Computershare business lines including, *inter alia*, its class action claims administration division (KCC). *Id.* at 46:22–49:14. AlphaPlus submitted a claim on behalf

---

[15]     *See, e.g.*, Oct. 20, 2022 Crim. Tr. at 42:1–15.

of Nimello, which KCC rejected for lack of documentation. *Id.* at 58:6–13. AlphaPlus then submitted documents to "verify" the trades that were obviously doctored, and KCC elevated the matter to Dearden. *Id.* at 58:6–20. Dearden was then tasked with validating the claims. In doing so, he sent the trade information for all Sham Clients to their purported brokers (*i.e.*, SpeedRoute for Nimello and Quartis and Gentem Capital for Invergasa). *Id.* at 58:1–60:12, 71:25–72:17, 74:3–8.

However, SpeedRoute could not validate the trades purportedly made by Nimello or Quartis and, even more damningly, indicated that the reports furnished by AlphaPlus did not comport with SpeedRoute's standard business practices. *Id.* at 72:25–73:6. Additionally, Dearden called AlphaPlus to speak with Paul Delfino (who did not exist) and was instead directed to Punturieri. Punturieri then directed Dearden to Alex Vlastakis at SpeedRoute to validate the Nimello and Quartis trades. *Id.* at 101:8–102:13. Vlastakis was unable to do so. Dearden also connected with someone claiming to be the Director of Nimello, but his questions went unanswered. *Id.* at 149:16–165:3. Accordingly, Dearden deduced that the trades were not valid and the Nimello and Quartis claims were rejected. *Id.* at 72:25–73:6, 75:1–5, 103:21–106:13. Additionally, Dearden quickly alerted federal authorities to the fraudulent claims and, at the FBI's instruction, began recording relevant telephone calls[16] as he sought to verify the Invergasa claims. *Id.* at 80:9–14.

Dearden kept pulling at the strings of AlphaPlus, Nimello, Quartis, and Invergasa and soon realized that they all tied back to Cammarata. For example, Dearden called Gentem Capital ("Gentem") where he was referred to someone named "Chris." *Id.* at 83:9–85:11. However, it was

---

[16]     Many of these recordings were introduced at trial.

not Chris who spoke on Gentem's behalf but Cammarata. *Id.* at 86:7–89:19. Because Dearden understood Cammarata to be a representative of Gentem, Dearden sent a series of questions to Cammarata regarding discrepancies and peculiarities related to the Invergasa claims.[17] *Id.* at 91:8–93:23. Then, Cammarata, purportedly speaking on behalf of Gentem, connected Dearden with Juan Paublo Gomez at Invergasa. Gomez, in turn, identified Cammarata as his point of contact *at AlphaPlus* rather than at Gentem. Oct. 20, 2022 Crim. Tr. at 168:2–175:4. This was significant because Cammarata had previously represented that he was **not** affiliated with AlphaPlus and, moreover, Dearden knew Cammarata to be the former CEO at SpeedRoute which was also involved in the suspicious claims. *Id.* at 177:5–12. The full scope of Cammarata's scheme was then thrown into sharp relief. *Id.* ("[Cammarata] was trying to vouch for Nimello Holdings, as well as Quartis, now Invergasa, so the whole circle was coming full circle.").

### iii.   Cammarata's Tell-Tale Heart

"I woke up in the middle of the night thinking about JAIL," Cammarata wrote when claims were not processed smoothly. ECF No. 260-5 at 260. His troubled sleep makes sense. Indeed, Defendants knew that the scheme was entirely illegal all along. *See* Oct. 21, 2022 Crim. Tr. at 230:13 –16 ("By the time we got to Nimello, we fully understood what we were doing . . ."). Accordingly, while Dearden's investigation pressed on, Cammarata became increasingly concerned. ECF No. 260-5 at 96 ("This is so serious and needs to be mitigated ASAP."). At one point, Defendants discussed bribing SpeedRoute employees to vouch for the trades and cover their tracks. Oct. 21, 2022 Crim. Tr. at 113:23–114:12. Defendants also contemplated contacting

---

[17]     Following his calls with Dearden, Cammarata wrote to Cohen and Punturieri: "I think he believed everything . . . this buys us a little bit of time. ECF No. 260-5 at 42. Punturieri was relieved. "That gets me off the ledge for the time being," he responded. *Id.* at 43.

Dearden's supervisors to stifle his investigation. ECF No. 260-5 at 94–95. In their desperation, Defendants also weighed going to Dearden's home and bribing him with $1 million to drop the investigation. Oct. 22, 2022 Crim. Tr. at 93:12–94:3; ECF No. 260-5 at 93. Finally, Defendants discussed fleeing the country. Oct. 21, 2022 Crim. Tr. at 47:4–25 (Cohen describing the code word "blue house" which represented Cammarata's bright blue Bahamian home to which they would flee if something went "critically wrong."). Cammarata's nightmare was realized when, in November 2021, federal authorities raided the AlphaPlus office and Defendants' homes.

## III.    PROCEDURAL HISTORY

Both this action and the Criminal Case have involved substantial motions practice, hearings, postponements, and orders. Accordingly, the Court describes only the most relevant procedural history here.

### A.  The Criminal Action

Cammarata was indicted on October 28, 2021, along with Cohen and Punturieri, and a superseding indictment was returned on September 8, 2022. Punturieri and Cohen pled guilty to conspiracy to commit mail and wire fraud, conspiracy to commit money laundering, and tax evasion on October 13 and October 14, 2022, respectively. Crim. ECF Nos. 154, 164.

Cammarata's trial commenced on October 19, 2022, and involved fourteen witnesses called over six days and a significant volume of evidence introduced. Most notably, Cohen and Punturieri testified for the Government and Cammarata testified in his own defense (for approximately six hours). Through his testimony, Cammarata attempted to provide an innocent explanation for the above-referenced scheme. Put simply, Cammarata claimed that he owned the trades, they had been legitimately assigned to the Sham Clients, and, although Cohen and

Punturieri muddled the treatment of these claims, his and AlphaPlus' conduct was not nefarious. *See, e.g.*, Oct. 25, 2023 Crim. Tr. at 53:7–12. Despite the alternative narrative Cammarata set forth and the defense mounted by his highly-skilled counsel, on October 26, 2022, the jury returned a verdict finding him guilty of conspiracy to commit mail and wire fraud (Count I); four counts of wire fraud (Counts II–V); conspiracy to launder money (Count VI), and two counts of money laundering (Counts XI–XII). Crim. ECF No. 194.

Following trial, Cammarata moved for a judgment of acquittal or, alternatively, a new trial. Crim. ECF No. 264. The Court denied both motions on May 30, 2023. Crim. ECF No. 293–294. On June 6, 2023, the Court sentenced Cammarata to ten years of incarceration and to monetary liability totaling $48,020,572.65. Crim. ECF Nos. 306, 307. Cammarata's appeal is presently pending.[18]

### B.  The Civil Action

The Commission initiated this matter on November 3, 2021. ECF No. 1. That same day, the Commission filed a Motion for a Temporary Restraining Order Enjoining Violations of The Federal Securities Laws, Freezing Assets, Granting Other Relief, and Order to Show Cause (the "TRO"). ECF Nos. 2, 3. The Court entered the TRO on November 4, 2021 to preserve the status quo of Defendants' assets and prohibit the dissipation of the same. ECF No. 4. The TRO was extended on December 3, 2021. ECF No. 38.

On January 11, 2022, counsel for the Commission and all Defendants appeared before the Court to discuss the status of this case and an upcoming Preliminary Injunction hearing. ECF No.

---

[18]    A judgment is "deemed final for purposes of . . . collateral estoppel unless or until it is reversed on appeal." *Adelphia Gateway, LLC v. Pa. Env. Hr'g Bd.*, 62 F.4th 819, 828 (3d Cir. 2023) (quoting *Shaeffer v. Smith*, 673 A.2d 872, 874 (1996)).

64, 71. The next day, upon the representation that all parties (including Cammarata) agreed on the matter, the Court entered a Preliminary Injunction Order that extended the relief set forth in the TRO. ECF No. 66. Throughout the pendency of this case, the Court has liberally granted the release of assets to pay legal fees, property maintenance expenses, cost of living expenses, and education costs. *See, e.g.*, ECF No. 179.

This case was stayed and placed in suspense to protect Cammarata's Fifth Amendment rights. Due to the stay, Cammarata has not answered the Complaint, nor have initial disclosures or discovery been exchanged. Despite the stay, Cammarata, proceeding *pro se*, has enthusiastically defended against the Commission's claims and the Preliminary Injunction. Most relevant, Cammarata filed a Motion to Dismiss which the Court denied. ECF Nos. 142, 162. The Court lifted the stay in this case after Cammarata was sentenced in the criminal case. ECF No. 265.

The Commission now moves for summary judgment. ECF No. 260. Cammarata was served with this motion,[19] and he Responded on July 14, 2023. ECF No. 285. The Commission Replied on July 26, 2023. ECF No. 289. This matter is now ripe for consideration.

## IV.   STANDARD OF REVIEW

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[s]ummary judgment is appropriate when 'the pleadings, depositions,

---

[19]     On July 7, 2023, the Court directed the Clerk's Office to mail a copy of the Commission's Motion to Cammarata (notwithstanding that the Commission had previously done so). ECF No. 274. The Court has confirmed that the mailing address used and the location which the Commission served Cammarata were both correct. Additionally, the Court has not heard Cammarata complain that he has not received the Motion in nearly six weeks, despite his other filings on the docket.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. The non-movant opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute

sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## V.   DISCUSSION

The Court will grant summary judgment against Cammarata on Count I (violation of Section 10(b) of the Exchange Act) and Count II (violation of Section 20(e) of the Exchange Act).

### A.  Section 10(b) and Rule 10b-5

The Commission is entitled to summary judgment on Count I because of collateral estoppel and because no reasonable jury could find that Cammarata did not commit securities fraud under Section 10(b) of the Exchange Act.

### i.  Legal Standard

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). S.E.C. Rule 10b-5 implements Section 10(b) by,

17

*inter alia*, declaring it unlawful to make "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Accordingly, to prevail on its claim under Section 10(b) and Rule 10b-5(b) thereunder, the Commission must show that Defendant: (1) made a material misrepresentation (or omission)[20]; (2) with scienter[21]; and (3) in connection with the purchase or sale of securities.[22] *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010); *see also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 206 n.6 (3d Cir. 2001) (unlike private litigants, the Commission is not required to prove either reliance or damages).

## ii.   Cammarata Made False Statements of Material Fact with Scienter

Collateral estoppel, or issue preclusion, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citations omitted). By precluding parties from re-arguing matters that they have already had "full and fair opportunity to litigate," the doctrine "protect[s] against the expense and vexation attending multiple [actions],

---

[20]    Determining whether a misrepresentation is material is a fact-specific inquiry that asks whether the misrepresentation "significantly alter[s] the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Although materiality is frequently described as that which a "reasonable investor" would consider important, this is so because of the facts underlying the case law that has interpreted Section 10(b). While claims brought under Section 10(b) traditionally involve investors who allege that stock prices were manipulated, that is not the only context in which a Section 10(b) claim may be brought (discussed *infra*). Accordingly, the Court understands the materiality requirement, in this specific context, to be fulfilled if an individual (here, the administrator) would consider the fact important and altering the "total mix" of information available when deciding whether to buy or sell securities.

[21]    Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Martin v. GNC Holdings, Inc.*, 757 Fed. App'x 151, 153 (3d Cir. 2018) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[22]    Discussed *infra.*

conserve[s] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Sturgell*, 553 U.S. at 892 (internal citations omitted). Collateral estoppel applies when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *See, e.g.*, *Anderson v. C.I.R.*, 698 F.3d 160, 164 (3d Cir. 2012). As an equitable doctrine, collateral estoppel generally only applies when the party against whom an estoppel is asserted (or those in privity with the party) "had a full and fair opportunity to litigate" the underlying issue. *S.E.C. v. Teo*, No. 04-CV-1815, 2009 WL 1684467, at *23 (D.N.J. June 12, 2009) (quoting *Parkland Hosiery Co., Inc., v. Shore*, 439 U.S. 322, 328 (1979); *Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971)).

A criminal conviction "conclusively establishes the defendant's civil liability" as to those legal or factual issues that were resolved in the criminal proceeding. *See Anderson*, 698 F.3d at 164. For example, Defendants who are convicted of wire fraud are "precluded from contesting most of the facts upon which the SEC relies in proving his liability under Section[] 10(b) . . . and Rule 10b-5." *S.E.C. v. Chapman*, No. 13-CV-5648, 2021 WL 199539, at *5 (E.D. Pa. Jan. 20, 2021). This rule rings true here, where there can be no dispute that "the criminal case covered the same conduct during the same time frame at issue in this civil action [and] concerning the same fraudulent scheme." *S.E.C. v. Paul*, No. 16-CV-1326, 2023 WL 2562977, at *1 (E.D. Pa. Mar. 17, 2023). Indeed, collateral estoppel applies in the securities context as to any overlapping elements between the civil case and related criminal conviction. *See id.*; *see also S.E.C. v. Lazare Indus.*, 294 Fed. App'x 711, 714–15 (3d Cir. 2008); *S.E.C. v. Georgiou*, No. 09-CV-0616, 2023 WL

2351692, at \*2 (E.D. Pa. Mar. 2, 2023); *S.E.C. v. Parker*, No. 15-CV-1535, 2020 WL 6899795, at \*1 (W.D. Pa. Nov. 24, 2020).

In relevant part, the jury convicted Cammarata of four counts of wire fraud under 18 U.S.C. § 1343. In doing so, the jury found beyond a reasonable doubt that Cammarata: (1) "knowingly devised a scheme to defraud and to obtain money or property by materially false or fraudulent pretenses, representations, or promises or willfully participated in such a scheme with knowledge of its fraudulent nature"; (2) "acted with the intent to defraud"; and (3) used interstate wire communications in furtherance of the scheme. Oct. 26, 2022 Crim. Tr. 147:11–154:14 (jury instructions).

As to the first element, the Court instructed that the jury could not convict Cammarata "unless all [jurors] agreed as to at least one of the material misrepresentations." *Id.* at 149:14–15. Additionally, the Court clarified that: (1) "a statement, representation, claim, or document is false if it is untrue when made and if the person making the statement, representation, claim or document, or causing it to be made, knew it was untrue at the time it was made"; (2) "a representation or statement is fraudulent if it was falsely made with the intention to deceive"; and (3) "a material fact is one . . . which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." *Id.* at 149:16–150:13.

As to the second element, the Court provided that: (1) "to act with an intent to defraud means to act knowingly and with the intention or the purpose to deceive and to cheat in order to thereby obtain money, property, or something of value"; (2) the jury could "consider, among other things, whether the defendant acted with the desire or purpose to bring about some gain or benefit

to himself or someone else or with a desire or purpose to cause some loss to someone." *Id.* at 151:21–152:5.

These elements, which the United States proved beyond a reasonable doubt in the criminal case, address the same issues as the first two elements of the Commission's claim under Section 10(b) of the Exchange Act. Indeed, the first element of the securities fraud claim (that a defendant made a material misrepresentation or omission) is encompassed within the first element of wire fraud described above. The second element of the securities fraud claim (scienter) is encompassed within the second element of wire fraud. Accordingly, the factual issues necessarily decided by the jury in convicting Cammarata of four counts of wire fraud "conclusively establish [his] civil liability" here, s*ee Anderson*, 698 F.3d at 164, and Cammarata is therefore "precluded from contesting most of the facts upon which the SEC relies in proving liability under Section[] 10(b) . . . and Rule 10b-5." *Chapman*, 2021 WL 199539, at *5.

For the reasons described above, collateral estoppel bars Cammarata from re-litigating the first two elements of the Commission's claims under Section 10(b) and Rule 10b-5(b) and such elements are established against Cammarata as a matter of law.[23]

---

[23]     It bears brief mention that the criminal jury, when confronted with a higher burden of proof than would be required here, soundly and resolutely rejected Cammarata's narrative. Cammarata has claimed, and continues to claim, that the trades were "his" trades that he had simply assigned to the Sham Clients. This fable was wholly uncorroborated by the evidence introduced at trial other than Cammarata's self-serving, bald assertions. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (The party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"). In addition to relying on the criminal proceedings, the Commission attached to its motion nearly 900 pages of proffered evidence in the form of sworn declarations, text messages, emails, phone call transcripts, and falsified documents. Cammarata offers nothing other than the bald assertions that the criminal jury quickly rejected. Thus, even if collateral estoppel did not apply, there is no genuine issue of material fact because no reasonable jury could find for Cammarata on the first two elements of Count I.

### iii. Cammarata's Conduct Was Done in Connection with the Purchase or Sale of Securities

As described by the Third Circuit, "[t]he Supreme Court has addressed the meaning of 'in connection with' in two relevant opinions" related to securities transactions. *Taksir v. Vangaurd Grp.*, 903 F.3d 95, 97 (3d Cir. 2018). In the first case, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), the Court "embraced a seemingly broad interpretation of the phrase." *Id.* However, more recently, in *Chadbourne & Parke L.L.P. v. Troice*, 571 U.S. 377 (2014), the Court asked "whether the meaning of 'in connection with' extends further than misrepresentations that are material to the purchase or sale of a covered security" and concluded that it does not. *Id.* (cleaned up). Accordingly, unless a fraudulent misrepresentation or omission is "material to a decision by one or more individuals . . . to buy or sell a 'covered security,'" it is not made "in connection with" a securities transaction. *Id.* (quoting *Troice*, 571 U.S. at 397). However, the *Troice* decision clarified, rather than modified, *Dabit*. *Id.* Thus, the Court must keep in mind both *Troice*'s requirement that the material misrepresentation in some way induce the purchase or sale of a security and *Dabit*'s broad interpretation of Section 10(b).[24]

---

[24] The Court notes that prior to *Troice*, the "in connection with" requirement was exceedingly flexible. For example, the Court previously observed that securities laws prohibited "all fraudulent schemes in connection with the purchase or sale of securities, whether artifices employed involve a garden type variety of fraud or present a unique form of deception." *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10 n.7 (1971) (quoting *A.T. Brod & Co v. Perlow*, 375 F.2d 393 (2nd Cir. 1967)). Accordingly, "[n]ovel or atypical methods [of fraud] should not provide immunity from the securities laws." *Id.* Later, the Court wrote that the Exchange Act must be construed "not technically and restrictively, but flexibly to effectuate [the Act's] remedial purposes." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (quotations omitted). The Court notes these cases because *Troice* did not overrule them but, instead, provided a limiting principle to the broad interpretation of Section 10(b). *See Taksir*, 903 F.3d at 97. Indeed, two things can be true: Section 10(b) can be interpreted flexibly and there must be some eventual stopping point.

With these principles in mind, clearly, although Cammarata's scheme was not the "garden variety" type of securities fraud, it still violated securities law. The requirement articulated in *Troice*, that the fraud be material to the decision to buy or sell securities is satisfied here, where settlement funds that were held in escrow in money market accounts (which are securities) were liquidated to pay Sham Clients based on Defendants' fraudulent claims. ECF No. 260-7 ¶ 25; ECF No. 260-9 ¶¶ 3–4; ECF No. 260-10 ¶¶ 3–4; ECF No. 260-11 ¶¶ 4–7; ECF No. 260-12 ¶¶ 4–5; ECF No. 260-13 ¶¶ 3–6; ECF No. 260-14 ¶¶ 4–7; ECF No. 260-15 ¶¶ 4–6. The evidence leaves no question that administrators, in at least 130 instances, liquidated securities because of and subsequent to AlphaPlus' fraudulent claims on behalf of Sham Clients, thereby depleting the ownership interest in the relevant securities of both the administrators and the true class members. There is no genuine issue of material fact on this point. Therefore, though Cammarata's sophisticated fraud may be atypical, his misrepresentations were—at least in some instances—made in connection with the sale of securities. This holding involves both a flexible understanding of the statute, as guided by *Dabit*, while still requiring that the fraud be material to someone's decision to purchase or sell securities, as mandated by *Troice*. For this reason, the final element of Count I is satisfied.

However, the Court thinks it appropriate to describe all the ways in which Cammarata's scheme related to securities transactions more broadly. Put simply, Cammarata's scheme did more than "touch upon" securities transactions—it hinged upon them. Specifically: (i) the settlement distribution funds existed because of securities class actions or enforcement actions by the Securities and Exchange Commission; (ii) the settlement distribution funds were often held in securities until they were liquidated and distributed to claimants; (iii) Cammarata obtained and misused trade data about securities transactions; (iv) Cammarata only had access to such trade data

because of his role as an executive of a broker-dealer; (v) Defendants lied about who purchased securities; (vi) Defendants lied about who sold securities; (vii) Defendants lied about the price of securities purchased or sold; (viii) Defendants lied about the quantity of securities purchased or sold; (ix) Defendants lied about which entities cleared trades; (x) Cammarata used his expertise of the securities industry to guide AlphaPlus, by way of Cohen and Punturieri; (xi) Defendants submitted phony records of securities trades, including falsified brokerage records that used broker-dealers' logos to bolster their believability; (xii) Cammarata exploited his position as an executive of a broker-dealer to vouch for the fraudulent claims; (xiii) Sham Clients collected over $40 million because of the fraudulent claims; and (xiv) the scheme had the effect of diminishing the funds available for the actual victims of the underlying securities fraud.

Though the "in connection with" language of Section 10(b) may require something more than any fraud that tangentially relates to a securities transaction, *see Levine v. Diamanthuset, Inc.*, 940 F.2d 1478, 1485 (9th Cir. 1991), that is not the case presented here. There was nothing tangential about the role of securities transactions in Cammarata's scheme and, moreover, its success culminated, at least in part, in liquidating securities to pay out the fraudulent claims. Indeed, securities transactions were at the very heart of Cammarata's fraudulent activity. Accordingly, there can be no question that Cammarata's material representations were made in connection with the purchase or sale of securities and no reasonable jury could find otherwise. Thus, the final element of the Commission's claim under Section 10(b) is satisfied and summary judgment is appropriate.

### B.  Section 20(e)

Section 20(e) of the Exchange Act allows the Commission to pursue claims against "any person that knowingly or recklessly provides substantial assistance to another person in violation

of a provision of [the Act], or any rule or regulation issued [thereunder]." 15 U.S.C. § 78t(e).

Accordingly, to establish its claim against Defendant for aiding and abetting securities law

violations, the Commission must show: "(1) the existence of a securities law violation by the

primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part

of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement

of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

First, there can be no genuine dispute that AlphaPlus violated securities law and

Cammarata is precluded from arguing otherwise.[25] Additionally, Cohen has admitted liability

under Section 10(b) of the Exchange Act for this scheme. ECF No. 279. Thus, the first element of

Count II is satisfied by the securities law violations of either AlphaPlus or Cohen. Second, put

simply, Cammarata had actual knowledge of the fraud. As discussed, *supra*, Cammarata was the

---

[25]   Cammarata, in defending against the criminal charges, fully litigated the issue of whether his jointly owned company, AlphaPlus, filed fraudulent claims on behalf of Sham Clients. Though the Commission has not moved for summary judgment against AlphaPlus, the Court notes that collateral estoppel applies with equal force against AlphaPlus. "[C]ourts frequently find privity between a corporate entity and its controlling owner" where the party to the previous litigation adequately represented interests that are the same as those of the nonparty. *Reach Commc'n Specialists, Inc. v. Williams*, No. 13-CV-2388, 2023 WL 1967940, at *6 (E.D. Pa. Feb. 13, 2023) (collecting cases). While this rule more frequently applies to bind individuals to prior litigation involving a corporation, it also works in the reverse. *See id.* Indeed, collateral estoppel extends to "binding a corporation to the findings of a *previous criminal proceeding against an owner or controlling shareholder*." *Id.* (emphasis added). Cammarata, along with Cohen and Punturieri, owned and controlled AlphaPlus. Ruta Decl. ¶ 12; Oct. 20, 2022 Crim. Tr. at 197:14–22; 200:8–14. Accordingly, there is privity between Cammarata and AlphaPlus. Cammarata's wire fraud therefore has the same preclusive effect on AlphaPlus as it does on Cammarata.

Additionally, Cohen and Punturieri, pled guilty to, *inter alia*, conspiracy to commit wire fraud, the elements of which are: (1) two or more people agreed to commit wire fraud; (2) Defendants were members of that agreement; and (3) Defendants shared a unity of purpose and the intent to achieve a common goal. *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989). In pleading guilty, both Cohen and Punturieri admitted to the scheme in which they knowingly submitted false claims through AlphaPlus. As Cohen and Punturieri also owned and controlled AlphaPlus, their admissions similarly have a preclusive effect.

mastermind behind the scheme and all Defendants were entirely aware of its illegality. Indeed, Cammarata is precluded from arguing otherwise based on collateral estoppel principles and his wire fraud convictions. Additionally, the overwhelming evidence attached to the Commonwealth's Motion leaves no genuine question as to Cammarata's knowledge. Third, the evidence clearly demonstrates that Cammarata substantially assisted in AlphaPlus' fraud and, by extension, that of Cohen. Other courts have held that, to prove this element, the Commission must show that the defendant "in some sort associated himself with the [fraudulent] venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 212–13 (cleaned up).[26] The evidence submitted by the Commission clearly demonstrates his substantial assistance in aiding AlphaPlus' and Cohen's securities law violations. For example, Cammarata did the following, among other things: (i) aided in setting up off-shore shell companies; (ii) acquired the relevant trade data from SpeedRoute; (iii) drafted emails to be sent by Cohen and Punturieri[27]; and (iv) vouched for the trades as a purportedly independent broker-dealer. Accordingly, there is no genuine dispute that Cammarata aided and abetted in AlphaPlus' and Cohen's securities law violations. For these reasons, summary judgment is appropriate against Cammarata on Count II.

---

[26]    This standard, which is borrowed from Judge Learned Hand's "canonical formulation" for proving that a criminal defendant has aided and abetted in the commission of a crime makes good sense here. *See Rosemond v. U.S.*, 572 U.S. 65, 76 (2014).

[27]    One who drafts a statement that is ultimately "made" by another person in furtherance of a securities law violation is squarely within the scope of Section 20(e). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011) ("[T]he maker of a statement is the entity with [ultimate] authority over the content of the statement and whether and how to communicate it" rather than the individual who drafted the statement, accordingly, the "maker" is liable under Section 10(b) and the "drafter" is considered an aider and abettor under Section 20(e).).

## VI.    CONCLUSION

For the reasons set forth above, the Court will enter judgment in favor of the Commission and against Cammarata as to his liability on both Counts I and II. The parties may submit a proposed scheduling order to address the issue of damages. An appropriate order follows.


**BY THE COURT:**


**/s/ Chad F. Kenney**
_____
**CHAD F. KENNEY, JUDGE**